JOURNAL ENTRY AND OPINION
Plaintiff Anncarla Robinson-Jones, the Administratrix of the Estate of Daesha Preston, appeals from a judgment for defendants Ohio Permanente Medical Group, Inc. (Permanente) and various personnel involved with the delivery of Daesha in plaintiff's action for medical malpractice and other claims. For the reasons set forth below, we affirm.
On June 4, 1996, Robinson-Jones delivered Daesha Preston at Permanente. Daesha was premature, with a gestational age of 20.3 weeks, and expired approximately fifteen minutes after birth.
On May 22, 1998, Robinson-Jones, individually, and as the representative of Daesha's estate, filed this action against Permanente and the physicians and nurses that treated her. Plaintiff alleged that she contacted Permanente's Advice Line shortly before Daesha was born and reported symptoms which were in fact pre-term labor. Plaintiff alleged that the Advice Line nurses negligently failed to instruct her to go to the hospital until the following morning. Plaintiff asserted claims for negligence, wrongful death, violation of her right to access of her medical records and spoliation of evidence. Plaintiff also asserted, on Daesha's behalf, survivorship, and loss of the chance of survival claims. On November 19, 1999, plaintiff dismissed all but the wrongful death and loss of the chance of survival claims.
Defendants denied liability and the matter proceeded to a jury trial on March 13, 2000.
Plaintiff testified on her own behalf, and also presented the testimony of the Advice Line nurses, Lois Dyckman, Kathy Kortycka, and Sandy Goodman as if upon cross-examination. In addition, plaintiff presented the testimony of obstetrician Dr. Martin Binstock as if upon cross-examination, and also presented the expert testimony of Dr. Fred Duboe.
Plaintiff testified that she had previously delivered a healthy baby boy in 1979. In late February or early March 1996, she had various blood tests done at Permanente and discovered that she was pregnant. Plaintiff had some spotting at this time but improved after a few days of bed rest. A routine triple test conducted at approximately sixteen weeks gestation suggested the possibility of a genetic problem. She was advised by a midwife in the obstetrics department to undergo amniocentesis. Plaintiff declined to undergo this procedure but on May 1, 1996, she received an ultrasound examination at Permanente. Plaintiff was not informed of any problems or potential complications at this time.
On June 3, 1996, plaintiff reported for her morning bus-driving shift with the Cleveland Board of Education. At 10:00 a.m., she had a second ultrasound examination at Permanente. Plaintiff learned that she was having a girl. She was not told of any abnormalities. Later review revealed, however, that plaintiff's cervix appeared to be short, and this suggests an increased risk of pre-term labor.
Plaintiff returned to her job and worked until approximately 6:00 p.m. Upon returning home, she felt nauseous and took a short nap. When she awoke, she experienced cramping and a pinkish discharge, so she called the Permanente Advice Line. Nurse Lois Dyckman told her to stay in bed and drink plenty of fluids. Plaintiff further indicated that she had a fever of 99.4 degrees. Nurse Dyckman instructed her to call back if the symptoms persisted and that she should go to the emergency room if the bleeding worsened. The nurse indicated that plaintiff was not at high risk for pre-term labor and instructed plaintiff to complete a fluid challenge. She instructed plaintiff to empty her bladder, consume thirty-two ounces of water, rest on her left side, count any contractions, then call back in one hour.
Plaintiff called back one hour later as instructed and spoke to Permanente Nurse Katy Kortyka. Plaintiff told Kortyka that she was still having contractions approximately ten minutes apart but they were not as strong as they were previously. She continued to have pinkish discharge. Nurse Kortyka then called her supervisor, nurse Sandy Goodman, who instructed plaintiff to complete a second fluid challenge.
Plaintiff fell asleep at approximately 1:00 a.m. She slept until her alarm went off at 6:00 a.m. the following morning. At this time, plaintiff had severe cramping and went to the Permanente Emergency Room. She was dilated five centimeters. She was transferred to the Cleveland Cliniic and delivered Daesha a short time later.
According to plaintiff, the obstetrician who delivered Daesha, Dr. Martin Binstock, told her that if she had come to the Emergency Room the previous evening, they could have stopped her labor.
Lois Dyckman testified upon cross-examination that her job with the Advice Line is to perform triage. She gathers relevant information from the caller, then determines what to tell the caller based upon a set of written worksheets called protocols. In this instance, Dyckman followed protocol O:23 and determined from the call that plaintiff's situation was semi urgent, or requiring care within the next two to twenty-four hours. Based upon the protocol, Dyckman instructed plaintiff to complete the fluid challenge. Dyckman later referred the matter to Goodman.
Nurse Kathy Kortyka testified upon cross-examination that when she spoke to plaintiff on the Advice Line she was concerned that she was continuing to experience cramping and a pinkish discharge so Kortycka contacted Goodman, the case manager on call. Kortycka further testified that the protocols are guidelines which are developed by physicians; they are not used by nurses to make diagnoses.
Sandra Goodman, R.N., testified upon cross-examination that in 1996, she was in charge of the pre-term labor prevention program at Permanente and was a national speaker on this topic. She participated in the drafting of various protocols with the physicians in this department and with guidelines provided by the American College of Obstetricians and Gynecologists. The group also drafted a document for assessing a patient's risk of pre-term labor based upon certain indicators. Goodman stated that according to the risk screen, plaintiff was not at risk for pre-term labor.
Goodman further testified that pre-term labor is cervical dilation that occurs prior to thirty-seven weeks gestation. It also involves contractions. Contractions without dilation are not true pre-term labor. When true pre-term labor has begun, medication may prolong delivery for up to forty-eight hours. Finally, Goodman testified that the care which was administered to plaintiff in this instance met the requisite standard of care.
Martin Binstock, M.D., testified upon cross-examination that he reviewed protocol O:23 in June 1995. According to Binstock, the protocols are triage tools and the nurses using them do not diagnose from them.
Binstock further testified that plaintiff was not considered at risk for pre-term labor during the initial portion of her pregnancy, but she did have abnormal triple test results. However, he stated that Daesha appeared to have no structural abnormalities.
With regard to extending pregnancy once pre-term labor has begun, Dr. Binstock insisted that once true labor has begun, with cervical dilation, drug therapy can prolong the pregnancy for up to forty-eight hours. He disagreed with various studies describing longer extensions of pregnancy because they did not involve randomized placebo trials.
Plaintiff's expert witness, Dr. Fred Duboe, an obstetrician practicing in the Chicago area, testified that the Advice Line nurses who spoke to plaintiff deviated from the standard of care by failing to instruct her to go to the emergency room on June 3, 1996. According to Duboe, only a physical examination could have revealed that plaintiff was undergoing cervical changes. He agreed that twenty weeks gestation is not a viable age but he stated that medication could have halted plaintiff's labor if administered before midnight on June 3, 1996. According to Dr. Duboe, if medication were promptly administered, plaintiff could have delivered at full term. With regard to the placenta infection, Dr. Duboe testified that this occurred only after significant cervical dilation and therefore did not cause the labor, but rather, resulted from it.
Proceeding to the defendants' case, Dr. Binstock was qualified as an expert witness and testified that the protocol is consistent with other nationally published guidelines and is a tool for directing patients to the appropriate care. He further stated that plaintiff's initial symptoms of discharge and cramping did not necessarily indicate that labor was underway and could have been symptomatic of uterine irritability or other causes. According to Dr. Binstock, uterine irritability is frequently confused with true labor and true labor involves cervical dilation. Although tocolytic drugs may calm uterine irritability for extended periods of time, it can only extend a pregnancy for forty-eight hours once true labor has begun. Dr. Binstock determined, based upon the results of the ultrasound examination and the pathologist's report, that plaintiff was in true labor as the result of an infection or a problem with her cervix. Finally, Dr. Binstock concluded that plaintiff's pregnancy could not have been extended in light of these circumstances. He further concluded that nothing could be done to save Daesha in light of her non-viable gestational age.
Dr. David Burkons of University Hospitals testified as an expert for the defense. Dr. Burkons testified that the nurses monitoring the Advice Line did not deviate from the standard of care, since hydration and bed rest are commonly prescribed for complaints such as those reported by plaintiff. According to Burkons, since plaintiff fell asleep after speaking with the nurses, it is reasonable to conclude that her cramping was not severe overnight.
He further opined that no negligence occurred in connection with the failure to prolong plaintiff's pregnancy. Distinguishing true labor from uterine irritability, Dr. Burkons stated that drugs can only prolong true labor for approximately forty-eight hours. He further stated that a fetus will not survive if born at twenty weeks.
Finally, Dr. Burkons stated that although a surgical procedure can be employed to remedy an incompetent cervix during pregnancy, the procedure can actually cause labor to progress and can therefore be self-defeating. In his opinion, plaintiff had an acute chorioamnionitis, or an infection, and this infection caused the pre-term labor. He ruled out the possibility that the infection resulted from the labor in light of the degree of infection and the short interval between delivery and the time when plaintiff's water broke.
On March 17, 2000, the jury returned a verdict in favor of defendants. Plaintiff moved for judgment notwithstanding the verdict pursuant to Civ.R. 50(B) or, alternatively, a new trial pursuant to Civ.R. 59(A). The trial court denied the motion and plaintiff now appeals, assigning three errors for our review.
Plaintiff's first assignment of error states:
 THE TRIAL COURT ABUSED ITS DISCRETION BY (A) ALLOWING ONE EXPERT TO TESTIFY WITHOUT A WRITTEN REPORT, AND (B) A SECOND EXPERT TO TESTIFY BEYOND THE SCOPE OF MATTERS COVERED IN HIS REPORT.
Within this assignment of error, plaintiff complains that the trial court erred in permitting Dr. Burkons to testify to matters which were not contained within his expert report. Plaintiff additionally complains that the trial court erred in permitting Dr. Binstock, plaintiff's treating physician, to testify for the defense without providing an expert report to plaintiff.
 A. DR. BURKONS
In evaluating the correctness of the trial court's rulings as to Dr. Burkons, we note that we review the rulings of the lower court in the imposition of discovery sanctions only for an abuse of discretion. Nakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254 . "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. The Supreme Court has explained this standard as follows:
 An abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.
Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87.
Loc.R. 21.1(B) requires that expert opinions be set forth in a report provided to the opposing party and states in pertinent part:
 A party may not call an expert witness to testify unless a written report has been procured from the witness and provided to opposing counsel. * * * The report of an expert must reflect his opinions as to each issue on which the expert will testify. An expert will not be permitted to testify or provide opinions on issues not raised in his report.
See, also, Siegel v. Birnbaum (Feb. 20, 1997), Cuyahoga App. No. 69105 69059, unreported.
The primary purpose of this rule is to avoid prejudicial surprise resulting from noncompliance with the report requirement. Reese v. Euclid Cleaning Contrs., Inc. (1995), 103 Ohio App.3d 141, 147.
Similarly, Civ.R. 26(E) requires parties to supplement their discovery responses which pertain to the subject matter on which an expert witness is to testify. Pursuant to Civ.R. 37, expert testimony may be excluded as a sanction for the violation of Civ.R. 26(E). See Jones v. Murphy (1984), 12 Ohio St.3d 84. However, such a sanction is "extreme." Cucciolillo v. East Ohio Gas Co. (1980), 4 Ohio App.3d 36. In Nickey v. Brown (1982), 7 Ohio App.3d 32, the court cautioned that the provisions of Civ.R. 37 to exclude evidence should only be used when clearly necessary to enforce willful non-compliance or to prevent unfair surprise.
In this instance, plaintiff complains that the testimony of Dr. Burkons exceeded the scope of his report when he made statements regarding the non-viability of a fetus born at twenty weeks gestation and the survival rates of fetuses born at twenty-five and twenty-six weeks gestation. Plaintiff also contends that he exceeded the scope of his report by testifying that the chorioamnionitis caused plaintiff's pre-term delivery.
We are unable to conclude that the trial court abused its discretion in allowing Burkons to testify as to these matters. As an initial matter, we note that plaintiff's expert testified regarding the viability of fetuses of various ages. Further, the diagnosis of chorioamnionitis was contained within the pathology report provided to plaintiff in her medical records and was also considered by her expert. We find no unfair surprise stemming from the testimony into either of thee areas. B. DR. BINSTOCK In evaluating the trial court's determination that Dr. Binstock, plaintiff's treating physician, could testify as an expert in this matter, we note that Loc.R. 21.1(C) provides in pertinent part as follows:
 * * * In the event the expert witness is a treating physician, the Court shall have the discretion to determine whether the hospital and/or office records of that physician's treatment which have been produced satisfy the requirements of a written report. * * * The application of this rule is also reviewed in accordance
with the abuse of discretion standard. Savage v. Correlated Health Serv., Ltd. (1992), 64 Ohio St.3d 42; Luke v. Cleveland Clinic Foundation (March 28, 1996), Cuyahoga App. No. 69049, unreported.
Plaintiff complains that Dr. Binstock's testimony that the Advice Line nurses met their standard of care and his testimony concerning the viability of Daesha and the cause of the premature birth should have been stricken in this matter. We are unable to conclude that the trial court abused its discretion in connection with these matters. Plaintiff did not object to the testimony concerning the standard of care. We find no plain error affecting substantial rights since this testimony was offered in connection with his fact testimony that the Advice Line nurses simply instruct the patients in accordance with the physician-drafted protocols. Moreover, during the deposition of Dr. Binstock, defendant's attorneys informed plaintiff's counsel that he would be giving opinions at trial as to the care rendered by the nurses, and plaintiff's counsel acknowledged that the testimony would cover this area. Dr. Binstock's testimony concerning the viability of various gestational ages did not unfairly surprise plaintiff as plaintiff's expert accepted this basic information but disagreed as to whether the pregnancy could have been maintained. Finally, Dr. Birkons's testimony regarding the infection was derived from the pathology report that was provided to plaintiff and did not unfairly surprise plaintiff. This assignment of error is without merit.
Plaintiff's second assignment of error states:
 THE TRIAL COURT ERRED TO THE PREJUDICE AND HARM OF THE APPELLANTS WHEN IT DENIED APPELLANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT WHERE THE EVIDENCE ESTABLISHED THAT THE APPELLEES WERE NEGLIGENT PER SE. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANTS JUDGMENT NOTWITHSTANDING THE VERDICT AS THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Here, plaintiff complains that the trial court should have granted her judgment notwithstanding the verdict or ordered a new trial. Plaintiff contends that the judgment is contrary to law since the Advice Line nurses perform diagnoses and were negligent per se in this instance. She further asserts that the judgment is against the manifest weight of the evidence.
 A. MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT
With regard to procedure, we note that in Cardinal v. Family Foot Care Centers (1987), 40 Ohio App.3d 181, the court set forth the test to be applied in ruling on a motion for judgment notwithstanding the verdict:
 The trial judge must construe the evidence most strongly in favor of the non-movant and if upon all the evidence, there is substantial evidence upon which reasonable minds may reach different conclusions, the motion must be denied.
In this matter, we note that plaintiff presented evidence that the Advice Line nurses were negligent in failing to instruct her to go the hospital and that with prompt medical intervention, the pregnancy could have continued to term. Defendants presented evidence that the Advice Line nurses followed the physician drafted protocols for instructing patients, and did not deviate from their standard of care in this instance. Defendants also presented evidence that once true labor, as distinguished from uterine irritability, has begun, medical intervention can only delay delivery for approximately forty-eight hours. Finally, defendants presented evidence that they had conformed to their standard of care once plaintiff came to the hospital but that Daesha had not reached a viable gestational age and therefore could not be saved. Because reasonable minds could reach different conclusions from the evidence presented, the trial court properly denied the motion for judgment notwithstanding the verdict.
This portion of the assigned error is without merit.
 B. MOTION FOR A NEW TRIAL
A motion for a new trial is governed by Civ.R. 59, which permits a new trial to be granted on the following grounds:
* * *
 (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;
(7) The judgment is contrary to law;
 In addition to the above ground, a new trial may also be granted in the sound discretion of the court for good cause shown.
As an initial matter we note that it is well established that the decision of whether to grant a new trial lies within the sound discretion of the trial court. Verbon v. Pennese (1982), 7 Ohio App.3d 182.
With regard to motions for a new trial which are premised upon challenges to the weight of the evidence, we note that a judgment supported by some competent, credible evidence going to the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279. The weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact. Shore, Shirley Co. v. Kelley (1988), 40 Ohio App.3d 10.
Here, as noted previously, plaintiff presented evidence that defendants breached their duties of care by failing to admit her into the hospital at the onset of her symptoms, and that the administration of medication could have prolonged her pregnancy sufficiently to allow her to deliver at term. Defendants presented evidence that the nurses monitoring the Advice Line implemented protocols written by the physicians for patients meeting a predesignated set of criteria. Defendants also presented evidence that the nurses did not breach their standard of care in this matter, and that true labor, as opposed to uterine irritability, can only be delayed for a maximum of forty-eight hours with medical intervention. Defendants also demonstrated that in light of Daesha's non-viable gestational age, she could not be saved after labor had begun. From the foregoing, there is competent, credible evidence to support the verdict and the trial court therefore did not err in denying the motion for a new trial premised upon this contention.
With regard to the contention that the instant verdict was contrary to law, we note that the scope of nursing care in Ohio is outlined in R.C.4723.02. Pursuant to this statute, the practice of nursing as a registered nurse includes "administering medications, treatments, and executing regimes prescribed by licensed physicians, dentists, optometrists and podiatrists[.]" See, generally, Lindon v. Middletown Regional Hospital (November 13, 1995), Butler App. No. CA94-07-148, unreported.
R.C. 4723.151 precludes nurses from practicing medicine and states:
 Medical diagnosis, prescription of medical measures, and the practice of medicine or surgery or any of its branches by a nurse are prohibited."
See, also, Richardson v. Doe (1964), 176 Ohio St. 370,
In Berdyck v. Shinde (1993), 66 Ohio St.3d 573, paragraph five of the syllabus, the Supreme Court held:
 Though nurses are prohibited from practicing medicine, the fact that a particular act is within the duty of care owed to a patient by an attending physician does not necessarily exclude it from the duty of care owed to the patient by a nurse, and such act is not excluded from the nurse's duty if it is within the standard of conduct required to satisfy the nurse's separate duty of care.
The Court explained:
 The standard of conduct required of a nurse cannot include the process of medical diagnosis and treatment, which is reserved to the physician. Nevertheless, the fact that a particular act is within a physician's duty of care does not necessarily exclude it from the duty of care owed to the patient by the nurse. Depending on the facts and circumstances, the same act may be within the scope of their separate duties of care because it is, coincidentally, within their respective standards of conduct. Whether it is or is not is a question of fact to be determined by the standard of conduct required, which is proved by expert testimony.
* * *
 Whether the standard of conduct articulated by this expert witness governs the nurses' duties of care is a question of fact, determined from all relevant facts and circumstances. The trier must determine whether the course the witness recommends is reserved to the practice of medicine and, therefore, outside the duties of a nurse.
In this instance, as noted previously, defendants presented evidence that the protocols were a triage device, drafted by the doctors, by which the physicians' instructions were conveyed to the patient under a given set of pre-described circumstances. The defendants' evidence further indicated that the nurses merely implemented the instructions on the protocols. The evidence therefore demonstrated that they simply administered treatments, in accordance with R.C. 4723.02 and failed to demonstrate that the nurses conducted any diagnoses or that they otherwise breached the limitations of R.C. 4723.151. See Lindon v. Middletown Regional Hospital, supra, (agency that followed "standing orders" of physicians did not breach R.C. 4723.151). The trial court therefore correctly determined that the verdict comported with the law and did not err in refusing to grant a new trial.
Affirmed.
It is ordered that appellees recover of appellants their costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, A.J., AND TERRENCE O'DONNELL, J., CONCUR.